ARTHUR TICKLE ENGINEERING WORKS, INC., Libellant,

v.

OIL TANK CLEANING CORPORATION, Respondent.

OIL TANK CLEANING CORPORATION, Libellant,

v.

ARTHUR TICKLE ENGINEERING WORKS, INC., Respondent.

Nos. 60-A-355, 60-A-844.

United States District Court E. D. New York.

Feb. 6, 1963.

ZAVATT, Chief Judge.

The above entitled actions were consolidated for trial and for all other purposes by the pre-trial order of Dooling, J., dated and filed May 18, 1962. Libellant in 60–A–355, hereinafter referred to as Tickle, sues to be indemnified in the sum of $7,144, which it claims is the amount of damages it has sustained by reason of the negligence of the respondent, hereinafter referred to as Oil Tank, in its performance of a contract between the parties pursuant to which Oil Tank cleaned and gas freed the No. 3 port deep tank and double-bottom tank of the U.S.M.S. General Buckner, hereinafter referred to as the ship. Oil Tank sues Tickle in 60–A–844 to recover the sum of $1100, alleged to be the agreed value of these services, and the further sum of $2175, alleged to be the reasonable value of additional services rendered in cleaning up certain oil spillage on the ship at the specific request of Tickle. The parties agree only that the value of Oil Tank's cleaning and degassing services is $1100. They are not in agreement as to the amount of Tickle's alleged damages or the value of Oil Tank's additional clean up services. As to the latter amount the parties were relieved of their stipulation at pre-trial that the fair value of these services is $2175. Only the questions of liability were tried.

Tickle is in the ship repair business. It makes repairs to ships of the United States under a master contract with the Department of Defense, United States Military Sea Transportation Service, Atlantic Area, Clause 10(b) of which provides that:

> "The Contractor shall be responsible for and make good at its own cost and expense any and all loss of or damage of whatsoever nature to the vessel (or part thereof), its equipment, movable stores and cargo, and Government-owned materials and equipment for the repair, completion, alteration of or addition to the vessel in possession of the Contractor, whether at the Plant or elsewhere, arising or growing out of the

Macklin, Speer, Hanan & McKernan, New York City, for Arthur Tickle Engineering Works, Inc.; John C. Hart, New York City, of counsel.

Mendes & Mount, New York City, for Oil Tank Cleaning Corp.; John J. Sullivan, John E. Lawler, New York City, of counsel.

performance of the work, except where the Contractor can affirmatively show that such loss or damage was due to causes beyond the Contractor's control, was proximately caused by the fault or negligence of agents or employees of the Government, or which loss or damage the Contractor by exercise of reasonable care was unable to prevent,
* * * "

Tickle received a job order under this master contract to make "Voyage Repairs" to the ship including Item No. 3, "Repairs to Fuel Oil Heating Coil." This item required Tickle to clean and gas free the No. 3 port double-bottom tank "in accordance with Standard Item #13, issued 1 March 1958," before making the specified repairs. After having made those repairs, Tickle was required to "close up tank using all new gasketing material and any required new bolting material." Standard Item #13, entitled "Cleaning and Gas Freeing Spaces," required Tickle to deliver a "gas free certificate signed by a certified chemist" to "the Assistant Port Engineer" of Military Sea Transportation Service, Atlantic Area. After Tickle performed all of its repairs to this tank it was required that the tank "shall be closed in good order, complete with new jointing and required new bolting material, in the presence of the Assistant Port Engineer and the Chief Engineer of the ship."

Tickle subcontracted the work of cleaning and gas freeing the #3 port double-bottom tank to Oil Tank, first by a telephone call to the President of Oil Tank asking for a bid on the job of cleaning and gas freeing this tank to the satisfaction of a certified chemist, Military Sea Transportation Service inspectors and Tickle inspectors and accepting Oil Tank's bid either in that or a subsequent telephone call. The trial established that the certified chemist was to be one furnished and paid for by Tickle, and the Court so finds.

Following the final acceptance of Oil Tank's bid, Tickle mailed a "Purchase Order" to Oil Tank, dated October 26, 1959. The "Terms and Conditions" of the purchase order indicate that it is designed for use when Tickle purchases merchandise from others, for they are stated in terms of "The Vendor," "the goods listed on this order," "contents must be marked on all packages," and "any suit for infringement of patent brought against" Tickle "by reason of the use of such goods." One of the terms and conditions is a save harmless provision as follows:

"In consideration of this order the Vendor agrees to save us harmless from all claims for personal injuries, including death and any injuries to property, while engaged in carrying out the work called for herein whether or not such injuries are attributable to our negligence. It is expressly agreed that workmen engaged upon the said work shall at all times be considered the employees of the Vendor."

Tickle does not contend that this condition is valid or applicable insofar as it purports to hold Oil Tank liable for Tickle's negligence.

■ Oil Tank cleaned out and gas freed the tank on October 27, 1959. There is no testimony as to whether Oil Tank received the purchase order before or after it performed its work. However, there is testimony that Oil Tank has performed this kind of work for Tickle over a number of years prior to October 1959; that similar purchase orders containing the same terms and conditions have always followed Tickle's acceptance of an Oil Tank bid; that Oil Tank, therefore, was aware of this practice and of the said terms and conditions. I find that these terms and conditions are a part of the contract between the parties. It remains to be determined what effect, if any, this save harmless clause has in this case.

The relative locations of port holds No. 2, 3 and 4, the port No. 3 deep tank and the port No. 3 double-bottom tank are as shown on the diagram (Oil Tank's Exhibit A) annexed as Appendix 1. Al-

APPENDIX 1

though a swash deck separates the D/tank and the double-bottom tank and some witnesses referred to both as "the double-bottom tank" the court is distinguishing each so as to speak in terms suggested by the diagram. Oil Tank completed its work on October 27, 1959 at about midnight and left the ship. Since Tickle was required to work in the D/tank and the double-bottom tank after Oil Tank had completed its work and a chemist had to enter both and test them before Tickle's men commenced their work, Oil Tank did not close any of the manholes which it had opened in order to do its work. Oil Tank had opened manholes A, B, C and D and also the "trap door" leading to manhole C. On the morning of October 29th a chemist tested the D/tank and double-bottom tank. He entered the latter by way of both manholes C and D because the baffle, shown on the diagram, did not permit him to reach the portion of the tank under manhole D, the forward end, by way of manhole C. Thereafter, on the same day, Tickle completed its repair work; closed manholes A, B and C in the presence of the ship's engineer and left the ship.

That evening the ship began to take on oil. At about 2:00 A. M. on October 29th, oil was discovered in the No. 2 hold, shown on the diagram. Inspection revealed that approximately 2,686 cubic feet of oil had flowed into this hold to a depth of approximately eighteen inches to two feet. Before the source of this oil was located, Tickle requested Oil Tank to pump it out. No price was agreed upon for this work but it was the understanding of the parties that Oil Tank was to be paid on a quantum meruit basis. Oil Tank performed this work that day, during the course of which the source of this oil was discovered. Manhole D was open. The manhole cover was standing up against the bulkhead in the recessed area of hold No. 2 near the open manhole. This is the work for which Oil Tank seeks $2175 in case number 60–A–844, in addition to the agreed price of $1100 for the cleaning and de-

gassing. Because of this overflow, hold No. 2 sustained certain damage which was repaired by or in behalf of Tickle, the cost of which is alleged to have been $7144. The parties have stipulated that Tickle did in fact expend this amount and that Oil Tank also waived proof of such payment as a condition precedent to recovery in indemnity, without admitting that Tickle was required to expend this sum as between it and the Government. Harris v. Standard Accident and Insurance Company, 297 F.2d 627 (2d Cir., 1961); Friedman v. Typhoon Air Conditioning Co., 205 F.Supp. 22 (E.D.N.Y.1962).

■ Tickle contends that Oil Tank was negligent in the performance of its contract to clean and gas free D/tank and the double-bottom tank, in that it was under a duty to report either to Tickle or to ship's personnel the fact that it had opened D manhole and failed to do so. It is the custom in the trade that the contractor, Tickle, is required to open the manholes for the subcontractor, Oil Tank, and to close them after the contractor (in this case, Tickle) has performed its work. When Oil Tank came on board on October 27th, Michelson, its supervisor on board, asked Bogaard, Tickle's supervisor on board, if he had any men on board to remove the manhole covers. Oil Tank's supervisor did not specify any particular manholes. Oil Tank had never before cleaned this tank. Bogaard replied that he did not have men aboard to open the manholes and requested Michelson to have Oil Tank's men do so. Michelson then asked the ship's Engineer on watch to have a crew member designate the location of the manhole covers. A member of the crew escorted Michelson to hold No. 3 where he pointed out manholes A and B. Oil Tank men then opened these manholes and cleaned out D/tank. Upon discovering that there was no means whereby a person could gain access to the double-bottom tank from D/tank, Michelson and some of his men explored the area, discovered a means of access via the "trap door" to manhole C, reached the double-

bottom tank thereby and commenced to clean it at about 4:30 P.M. Up to this time, neither Michelson nor any Oil Tank personnel knew that forward end of that tank could not be reached via manhole C. Sometime between 4:30 P.M. and 5:00 P.M., Michelson left the ship. Before doing so, he met Tickle's supervisor, Bogaard, and told him that his men had opened manholes A, B and C and to be sure to cover "the manhole under the reefer box," i. e., manhole C.

The Tickle workgang left the ship at about 5:00 P.M. and did not return until 7:30 A.M. the following morning. During their absence, the Oil Tank men continued their work until about midnight of October 27th. At about 6:00 P.M. on that day, Lytell, a tank washer in the employ of Oil Tank (who as of the date of the trial had been so employed for ten years) was working in (hosing out) the aft end of the double-bottom tank. Unable to hose out the five "frames" at the forward end because of the intervening "bulkhead" or "frame," he so reported to another Oil Tank employee, Gallo, (who was acting as supervisor during Michelson's absence). Gallo sought and found a means of access to the forward end of the tank, manhole D, in hold No. 2 and he and some of his men removed the cover thereof at approximately 6:30 P.M. Oil Tank personnel completed their work and left the ship at about midnight.

Between 8:00 and 9:00 A.M. the following morning, Guarcini, a chemist engaged by Tickle, came aboard the vessel to test the D/tank and double-bottom tank. In order for such a chemist to be able to issue a certificate that this area is safe for men and safe for fire, he must reach and test the air in all the compartments of the tank. In the instant case, he would have to enter not only the aft end but also the forward end of the double-bottom tank. And, in fact, the chemist did enter the aft end via manhole C and the forward end via manhole D. How did he locate manhole D? He had never before inspected this

tank. The chemist's recollection of how he found it is, to say the least, hazy. He says that it is his usual practice, when coming aboard a vessel, to speak to the contractor's supervisor (Tickle, in this case) who directs him to the tank to be inspected and/or to then consult the ship's plans in the cabin of the Chief Engineer. He does not recall whether any Tickle employee or any ship's officer or crew member told him about manhole D. Nor does he remember whether he consulted the ship's plans. Nor does he remember how he found manhole D. I find that he learned of manhole D either from a Tickle employee or a member of the ship's personnel on board that morning. Before leaving the ship at about 10:00 A.M., the chemist spoke with Tickle's supervisor and told him that he found the D/tank and the double-bottom tank to be safe. He did not mention manhole covers

Thereafter, that same day, Tickle's men entered the aft end of the double-bottom tank and repaired the heating coils during a part of which time the ship's engineer and a M.S.T.S. surveyor were down there with the Tickle men. A Tickle pipefitter, Eisenbeck, entered this tank later that day with the ship's first Engineer to ascertain whether any dirt or rags had been left in the tank by Oil Tank cleaners before closing up the tank. The engineer accompanied him for this purpose and also to insure that no one was in the tank. Both Eisenbeck and the engineer could flash lights. Eisenbeck crawled forward as far as "the bulkhead." He testified that, when he reached that point, "I was chicken. I am afraid of going into confined spots. When that bulkhead came above me, I don't bother taking a look in the back;" that the engineer also "got chicken." At about 3:30 to 4:00 P.M. manhole covers A, B and C were secured by Tickle personnel under the supervision of the First engineer.

The recessed areas above manholes C and D are the result of alterations made sometime after the construction of the

**222**

ship. Exhibit 9 includes plans showing these alterations. Michelson, Tickle's supervisor, testified that "a boxed in manhole, with the opening from the No. 2 into the No. 3 double-bottom" is shown in the plans. I so find. It is incredible that neither the ship's personnel nor Tickle personnel were aware of manhole D, in light of the fact that Gallo and the chemist engaged by Tickle located it.

Tickle contends that it is the custom in the trade that one in the position of Oil Tank is under a duty to advise either the contractor or ship's personnel as to what manhole covers it has removed. In support thereof it refers to the isolated instance in this case when Michelson told Tickle's supervisor (as he was leaving the ship) that manholes A, B and C had been opened up. It is to be noted that this conversation took place before Oil Tank had completed its work and before it had discovered and opened up manhole D. This latter event occurred when no Tickle personnel were on board. I find that Tickle has not established any such custom by a fair preponderance of the credible evidence.

■ I conclude that Oil Tank performed its contract in a good, careful and workmanlike manner; was not negligent and is entitled to recover the agreed price for its work, labor and services in cleaning and gas freeing the No. 3 D/tank and double-bottom tank; that it is entitled to recover the fair and reasonable value of its work, labor and services in removing the oil spillage from port hold No. 2; that Oil Tank is entitled to judgment dismissing Tickle's libel.

The foregoing constitutes the court's findings of fact and conclusions of law. The parties may submit, within ten days from the date hereof, any further proposed findings and conclusions. If the parties cannot agree upon the fair and reasonable value of Oil Tank's services in removing the oil spillage, the court will refer that question of fact to a Master to hear and report.

Settle an order on or before fifteen days from the date hereof.